and others. Arguments not to exceed 15 minutes per side. Mr. Lieber for the appellant. Good morning, your honors. May it please the court, I would like to reserve two minutes for rebuttal. In the, about, I guess it's now 14 years ago, John George filed a discrimination case against Youngstown State University. It was not a garden variety discrimination case. He was up for tenure at the time. There was, and he deserved it. He had done a good job. A dean had decided that his position should be given to an undergraduate who was his student and friend and African American. John George did not get the job. He then implemented a procedure for an elite tenure committee of the most elite professors available in the university. John George asked for such a position and it was granted. They said you deserve tenure. Still, the president at the time refused to give him tenure and so he had to file this case. He got relief. He filed the previous case. The previous case. He alleged age discrimination and race discrimination. That's correct, your honor. Those are the two grounds. Then there was a settlement. We actually know what the facts are. You know the facts. It's a very significant case. The party settled in February of 2008 a dean named Martin Abraham who had succeeded the dean who wanted an undergraduate to have this tenure position. She had been demoted and then left on disability. He was her friend. He had been her student at the Rensselaer Polytechnic Institute. He was charged with administering the settlement which went on until 2015 in various forms. He's terminated just 30, 60 days or something after they've satisfied their obligation to pay him his retirement benefits or his health benefits or whatever the benefits went with the settlement and right after their obligation he's terminated. That is correct, Judge Griffin. Three weeks later. As soon as the benefits, and of course that's a very critical part, health care benefits of compensation probably as important to most people as their jobs. As soon as they were terminated on April 5, 2015, John George was Then there's discussion in the connection with his termination about the settlement agreement and how he can be let go now. Right. There was gratuitous discussion. The dean at the time, Dean Sturrus, approached then Provost Martin Abraham who was a decision maker for term positions and Martin Abraham gratuitously said, Our obligations for reinstatement to John George, it was clear it was John George because he's the only reinstatement person, are finished now. Very much like the Terry case in this circuit where there was one out of seven educators, I believe, who was let go and there was a mention of his health. Not of his protected litigation and reinstatement status but of the health. They say their nondiscriminatory reason was budgetary restraints. I'm sorry? The budget restraints are the nondiscriminatory reason that led to his termination. Yes, Your Honor. That's a valid nondiscriminatory reason. What did you do to show that that was pretextual? Many, many things. Okay, tell me. They said that they stood to lose between one and ten million dollars. We showed that 15 people, 15 faculty were retiring at that time. It was 1.5 million dollars of savings. We showed that this was not a reduction in force. Provost Abraham said, well, I've got 40 people on the chopping block for a reduction in force. Only John George, one out of 40, was picked. Now, Your Honors, Sixth Circuit looked beyond that in the Libby Owens Ford case when 11 people out of 400 were riffed, if you will. This is basically the same percentage. There was no loss in the STEM college at that time. Enrollment, and this was one sector of the university, enrollment and revenues were stable. There was no asking the dean to, for example, identify positions which were superfluous or duplicative. Isn't it the argument that he was teaching the intro level classes and that's the easiest to substitute a non-tenure person to teach those kind of classes, an adjunct or something like that? I would dispute that, Your Honor, on the facts. That's the argument. Yes, but the facts on the ground militate against that. For example, it didn't work, and so they re-advertised the job with a different name, same job, lecturer, School of Technology. They even advertised it as a tenure track position. What was going on was that there was a failure or a decline in terms of retention and success of these students, so they were going to advertise the job again, and they did. Once he applied- That's after the decision that we're talking about? That's one of the decisions that we're talking about, Your Honor. That's one of the later decisions. I understand. Okay. You're talking about the decision not to rehire him. The argument was they have this terrible financial problem, and the way to deal with it was somebody who was teaching intro level classes. You say, well, later on that didn't turn out to be the case, but that doesn't go to whether it wasn't the reason in the first place. First of all, John George is also an expert in fluid dynamics. They didn't let him teach those courses. He tried to teach those courses. In addition, there was pretext in the sense that Dr. Abraham said that we have to let John George go because Professor Vuksanovich is coming back. Professor Vuksanovich actually taught design and manufacturing, and there were term faculty who were teaching his courses when he left. They were concerned, especially one of them, that he would be let go, this substitute term faculty member, when Vuksanovich came back. Vuksanovich came back, and then they made up, and they said this, Provost Abraham said, contrary to his evaluations in the past, both of John George and of the replacement persons for Vuksanovich, that John George left because he had been replacing Vuksanovich. That was false. That was pretextual. That was contrived to justify letting John George go. So, yes, there was other pretext information. The statement that with regard to teaching the developmental courses, which are within the mission of the university, very critical, that somehow that this is easier to replace, that's just a subjective statement. Issues of fact, maybe. It's an issue of fact. You're arguing there's genuine issues of material fact, that they targeted him, or whether these reasons really were the reasons, but we can't say as a matter of law that it wasn't pretextual or not. There's enough there for a trier of fact to figure that out. Absolutely. A jury should say. Are you familiar with this unpublished case in Alberti versus Columbus Township? I have read that case, yes. So how do you distinguish that? It has a lot of language that kind of cuts against your position. Well, I think basically there is not as much clear pretext in Alberti, and I would suggest that the dissent in that case is more in keeping with Reeves versus Sanderson plumbing, which is the law of the land. It's the United States Supreme Court precedent. And many of your cases, I would say, are. You're saying that case is wrong, then. I'm saying I don't. It's not wrong. You decided it. I'm not saying it's wrong. I'm saying that I don't agree with it. I don't agree with it. There's much more pretext in this case, and I can give you a litany of it. I can keep going with it, that didn't exist in Alberti. But in Alberti, I think that this court went beyond Reeves into a pretext plus analysis, which this court has rejected again and again. So I would say there are decisions of this court, like Ross versus Campbell-Soup, for example, where you have not had pretext plus. You have said we will adhere closely to the Reeves guidelines. So that would be my answer. Okay. Now, there was, as I said, there was much pretext evidence that the court failed to consider the people who were. Another aspect of pretext was that Martin Abraham, the provost at the time, claimed that he did not renew four older faculty. Well, if you look behind that, which is our job as counsel at summary judgment, that was not true. Two resigned. One was disciplined for sexual harassment. Another had a green card problem and had to leave. So he did not non-renew older faculty. Then there's the district court in Youngstown tried to articulate, go beyond what this court has done and articulate a bright line test for the length of time. I see my time is up. Yes. Tried to articulate a bright line test for length of time that one would be off. That is in sharp distinction with a number of your cases, including Sharp v. Aker. And during the time when John George was there, she refused to look at the context. There was consistent disparate treatment and isolation of John George. He was not permitted to serve on search committees. He was not allowed to be an accreditor, things he had done successfully before. He was not allowed to teach in thermal fluids and fluid dynamics. He wasn't treated equally. He was not treated equally. And this is just a continuation. Right. And it happened throughout the time during his reinstatement period. Martin Abraham knew people didn't like that he was reinstated, that he came back. This was brought to his attention, and he said in his deposition, yeah, I was aware that there was discontent amongst the faculty, which, of course, he's the head of as the provost. So this is a very different case than a standard pretext case where there's no context evidence. There's contrivance throughout this case. Preselection. Preselection is enough to go beyond Reeves. You have said that. And I forget the name of the other cases where you have said that. That's enough. You're in the protected class and there's evidence of preselection. We have two jobs where there's clear preselection. And he was qualified. That's the law of the case. That's what the judge said. But there was preselection. He made out the prima facie case. In any event, this is a case that cries out for a trial. Thank you. Thank you. Good morning. May it please the Court. Drew Pearsall on behalf of the appellees in this matter. Your Honors, John George alleges four adverse actions in this case, one of which is his non-renewal, which was the primary focus of what you just heard. The district court properly determined that Dr. George was unable to establish the fourth prong of his prima facie case with respect to the non-renewal of his term faculty position, that being a causal connection. This is the unusual case in which ten years passed between Dr. George's last instance of protected activity, which was suing the university back in 2006, and his non-renewal in April of 2015. As recognized by the district court, this circuit held in Furr v. Hazel Park that a lack of temporal proximity alone can be fatal. Temporal proximity is within 30 days after their obligation of the settlement agreement expired. I mean, to me, you've got temporal proximity because they acted right after they no longer had an obligation to him. And the obligation started ten years before that, but it continued for ten years, and as soon as that expired, bingo, he's gone. I mean, to me, you've got temporal proximity. I would respectfully disagree with that position for a couple of reasons. One is that the entire focus of this case has been on the year 2012 when John George's employment, he was essentially guaranteed employment through the end of academic year 2012. YSU was free to terminate his contract after that. Okay, but they still had to pay him his benefits, right, until 30 days after, they terminated 30 days after their obligation to pay benefits. That was already baked into the settlement agreement. He had to receive health insurance. It's part and parcel of the settlement agreement. And as soon as the terms of the settlement agreement have expired, within 30 days they fire him. And, you know, I think that's what temporal proximity is. But he was guaranteed that health insurance until his 65th birthday, which was the beginning of April. He was going to get that no matter what. If he was fired before then, he was going to get that health insurance. The idea is they could hire someone else. If they had to hire someone else to replace him, they'd be paying two sets of benefits. That's exactly right, Your Honor. The April 2015 health insurance expiration is of no moment, in my opinion, in this case, because they were contractually obligated to pay him. I see your argument there, but I wonder what other arguments you have. The problem with the argument is that while he was employed, they were getting something from him. They had a spot that was being filled, and they had the plaintiff working in that spot. So it became more expensive to pay those health insurance if they had fired him and they had to pay his replacements benefits, and he's still getting the health insurance benefits. It would have been health insurance expense on top of health insurance expense. There are economic ramifications to how they would manage that decision. You're correct, Your Honor. The April 2015 date was, again, it was baked in. It's not important to you, but apparently it's important to the plaintiff. It must be important. I wonder if we can accept the argument that's suggested here by my colleagues. Does that mean you lose with respect to that claim, or do you have another argument? No, I would like to think of a pretty good argument, and it's a case you alluded to earlier. This circuit in 2018 with the issuance of the Albert E. v. Columbus Township decision, if we're putting the prima facie case behind us and conceding for the sake of argument, and he establishes that budgetary reasons, as we know from the Albert E. case, is an extremely strong legitimate business reason to terminate an employee. So you say this is a reduction in force case? No, I've never used that term. Okay. Well, I mean, we have different standards for reduction in force, so we're not dealing with that. Correct. We're just dealing with the nondiscriminatory reason, which is financial. All right. We still determine whether there's a genuine issue of material fact on that, don't we? That's correct. But what Albert E. says is that you cannot pick at the edges of a budgetary reason. You have to indicate that there is no budget concern. That's what Albert E. says. The plain holding of Albert E. is that you cannot pick around those. If there's a budgetary concern, then they can discriminate against him because of, retaliate against him because of his suit? No, Your Honor. The pretext analysis is that the plaintiff, as we know from the burden-shifting paradigm, let's say he establishes this is a prima facie case, now burden comes to me. My legitimate business reason is budgetary constraints. It goes back to the plaintiff to demonstrate that that's a pretext for, in this case, retaliation. All right. So he has to demonstrate not that pick at the edges of the budget, whether or not the STEM college in particular was doing well, whether it wasn't doing well, whether attendance or enrollment was on the rise. What he has to demonstrate is that there were no budgetary concerns. That's what Albert E. stands for. And what we have here is a $10 million budget crisis that had to be closed, that gap had to be closed over two years. All right. Even if he can't disprove their budgetary concerns, if they can prove that they targeted him because of his prior lawsuit and that that was the real reason, then he prevails anyway, doesn't he, even though there were legitimate budget concerns? Well, he has to demonstrate, you know, that's when the Manzer factors kick in, and he has to demonstrate that it was a smokescreen or a subterfuge for retaliation. That's his burden. Yeah. That's what he's alleging. That's exactly what the argument is. Well, then let's talk about, let's break down the pretext reasons a little bit more. Here what we have is a $10 million budget crisis that had to be gapped, closed the gap over a course of two years. That's numerous individuals testified to that was the number and that was the two-year time frame in which the gap had to be closed. That was testified to by any number of administrators. Why John George was selected is that, to an earlier question, he largely taught introductory remedial courses, and the claim that he was forced to teach those courses is simply untrue. I asked Dr. George in his deposition if he was okay with teaching those courses, and his quote was, I was more than okay with teaching those courses. He wanted to teach those courses. That is where his area was when he returned in 2008 to the university. He taught in that area by his choice. He wanted to work in that area. So the assertion that he did not want to teach in that area is simply untrue by virtue of his own testimony. He was easily replaceable. If you take introductory remedial courses, that's not an issue of fact. Everyone testified to this. Every administrator, Carol Lamb, William Sturrus, Dr. Abraham, they all testified that it's also fairly common sense, I would say, that if someone's teaching an introductory mathematics course, your pool of candidates to teach that course is exponentially larger than if you let someone go that's teaching a high-level thermal dynamics course. Your pool of potential adjunct professors to teach high-level courses is obviously much smaller than teaching entry-level courses. Who were the high-level people who would have had to have been let go if they had held on to George? Well, the problem when we talk about teaching different courses that compounds this is pursuant to the collective bargaining in place for the faculty, they're allowed to take up to three-year unpaid leaves of absence. And that's what happened here. Well, taking all that into account, who were the people? I'm sorry, Honor. Well, I mean, if keeping him in place would have meant that more difficult people to replace would have had to have been let go, who were the more difficult people who would have needed to be let go? Difficult to replace. The person that was returning was Brian Vucsonovic. That's what I was alluding to earlier. He was on a three-year leave of absence. What we have here is the individuals that are teaching more special. Well, I thought in Discover he said that he thought he would be fired because he was more expendable than George. It was what that man had to say. But instead, George was let go. I believe you're referring to Gross. There was a professor by the name of Gross who was also a term professor, and he expressed, I'm concerned that I'm going to be cut. Everyone knew Brian Vucsonovic was returning. He's a tenured professor. Obviously, he has job protection. They cannot let him go. They can only let go of term faculty members. So there's any number of individuals that are teaching the higher-level courses that are tenured, such as Mr. Vucsonovic. So that's the problem that the university was facing. The intersection of this is that they have to balance teaching needs while also at the same time- Gross was tenured? Vucsonovic. Gross, I believe, was a term faculty member. He was. He was concerned that he was- He was term or he was tenured? He was term. He was a term faculty member. That's what I think Judge Clay is asking. Why was George the person rather than Rose? The answer can't be because Rose was tenured. No, Gross. Why was- Gross? What's his name, Gross? Gross, correct. Because John George taught introductory courses and was easily replaceable. He was easily replaceable, and I'm not trying to denigrate his credentials. That's just a matter of fact. Those are the most beloved teachers are the ones who teach those courses. That may be true as well, but that was the reason. Of course, he claims that he was qualified to teach more advanced courses, and as a result of the retaliation and discrimination, he was prevented from doing that, and that was the motivation as to why he was kept in introductory courses. In fact, he argues that much of that was a result of the bad feelings toward him as a result of the prior lawsuit that was settled. I'm not familiar. There's evidence that's offered in support of that, and, of course, your client has counterarguments to those arguments. The point is there seems to be a lot of disputed material facts involved in the entire lawsuit. Your Honor, I deposed Dr. George for a very long time. He never indicated to me that he desired to teach upper-level courses or more highly advanced courses. Did you ask him? Sir, I believe I did. I really do. Because I wanted to know if he was comfortable teaching- Your opposing counsel disputes that. He's shaking his head anyway. I'm sure. That argument was not developed in the discovery phase, and then we get to summary judgment, and then all of a sudden he says he wants to teach these higher-level courses. That's not what he said at his deposition. He said he didn't want to teach more advanced courses at his deposition? Is that what you're saying? I asked him directly, were you comfortable teaching the entry-level positions? His quote was, that was more than okay with me. That's not the question. He wants to teach the higher. Okay, that's- May I ask one question? You give an answer that's totally unrelated to the question I just asked you. It was not my intention. I apologize. If we may, putting the non-renewal aside, because there's a couple other adverse actions I'd like to get to, he applied for the Director of Dual Enrollment and Student Support Services. That position largely dealt with supervising high school math teachers who were teaching college courses for college credit and also supervising the Mathematics Assistance Center at YSU. He was not qualified for this particular job that he applied for by virtue of the fact he did not possess a master's degree in mathematics. All three search committee members testified unequivocally that they looked at his application, saw that he did not possess a master's in mathematics, and that was the end of the analysis for those particular positions. Hard to imagine that they couldn't have got around that, given that he had a PhD and maybe not directly, but co-located kinds of expertise and master's degrees so that it then becomes a factual issue whether that was sufficient. No, Your Honor. The chair of the department was Tom Wakefield, and he happened to be the chair of that particular search committee. Universities are very particular about their academic credentials. A master's in math is a master's in math. Was that a written requirement, or was that just what the three members wanted? No, it was a written requirement in the job posting itself. But then they hired somebody who didn't have a master's and created a special arrangement where she could have the job if she got the master's before the end of the year, and yet they're saying George couldn't be considered because he didn't have a master's. So, I mean, you have to wonder how critical that requirement was in the first place. At the university level, Dr. George could not supervise individuals who had a degree greater than his. He cannot do it. Well, yeah, but, I mean, they selected someone who also didn't have a master's in that field. She obtained the master's before the beginning of the academic year. So she supervised employees of an equivalent degree. So she met that requirement. He cannot supervise employees. Well, there were plenty of people that could have already had the degree, and that was the reason he didn't get it. He was told he wouldn't have the position. If you don't possess the minimum educational requirement. Which his replacement didn't. She did, Your Honor. They created a special arrangement that wasn't a part of the job description that they'd hire if she completed the degree before the end of the year. She completed it by August. Then once the academic year starts in September, she could supervise those employees properly. That's what happened there. Can I ask a question about the exhaustion of remedies? Sure. Because the contention is made that your party agreed not to insist on the exhaustion of remedies. That's just not true? It's just not true. What are they basing that on? I believe they're basing that on the fact that we've had to file joint stipulations of fact. And I'm not disputing that. And we did that. And some of the positions that were at issue in the joint stipulations were ones that were not exhausted. I asserted administrative exhaustion in my answer, both to the complaint and to the amended complaint. So that was in there since day one. So I never consented or waived administrative exhaustion. You can't identify. When I ask him and he points to something, that's going to be a surprise to you. It would be. And I would also point out. You don't say that in your reply. Let's see. In your brief, do you point out that you didn't consent? I can't recall if I stated that or not, Your Honor. It's just hard for us to deal with when we have contradictory statements in the briefs to try to figure it out. That's how I deal with these cases. I look for if both sides agree, I assume it's right. And if they disagree, I figure I can look in the record or in the law books and find out where it's different. But it's got to be pointed out to me. I understand your point, and it's well taken, Your Honor. The first year engineering technology is a position you're discussing. And what I want to say to you is that Dr. George filed a new lawsuit against YSU last month. So that position that you're referring to is now in a new lawsuit now that it's been administratively exhausted through the EEOC process. So I would hope that that addresses that particular position now that it's part of a new suit and the charge has been properly and administratively exhausted. Okay. Thank you. Thank you for your time. Thank you. Any rebuttal? Just a few points, Your Honor. First of all, the law of the case is that John George was qualified for the dual enrollment position. That's what Judge Pearson said. And that equivalencies were used. There's ample evidence of that at YSU. And that one of the members of the search committee asked You mean in terms of needing to have the master's degree? Yeah, exactly. I'm sorry. Yes, exactly. And that The law of the case that Yes, she said that he was qualified for the position. Okay, but they're appealing that, aren't they? He's raising that, but no, there's no cross-appeal here. No, they don't have to. No, it's not a new claim. It's a basis of your claim. They don't have to file a cross-appeal here, but they are disputing that, are they not? I don't know. Well, I think they did in their brief. Well, maybe they did in their brief, but that's not what the judge found. And it seems to me that they would have to She has set the law of the case, and they didn't file an appeal. Okay. All right. They don't have to file an appeal on that. As long as they Okay. It's a dispute for the jury, whether equivalencies are permissible or not, whether they created equivalency for the person who actually got it to move the goalposts for her. That's going to be in the case. Now, the parties agreed in the interest of judicial economy and finality to waive administrative exhaustion and requested the court to proceed to a ruling in the merits. You can look at our motion, record 63, page ID 4866 and 4873. This is in our motion for reconsideration. The court understood that and said there's a case You're reading from your own brief? I'm reading from the record, and there's nothing contrary in the record. What from the record? Is it your brief? Motion for reconsideration. You're reading from your own motion? That's correct. Okay. Below. That doesn't establish the stipulation because you said it in your motion. But the judge's decision does. The judge said We don't have to accept the judge's findings. No, but what happened here is the judge said, Okay, I understand that both of you are waiving this matter. It's not jurisdictional that you have to exhaust through the EEOC for something that comes up during the course of the case. I understand that. However, there is a case before the United States Supreme Court now on this issue, and I'm going to anticipate that the Sixth Circuit's ruling that exhaustion is not jurisdictional may be overruled by the United States Supreme Court. The United States Supreme Court unanimously said it's not jurisdictional. So that's what happened with that issue. Where did they agree not to rely on exhaustion? If you're citing me something that's a quote of you or a quote of the court, I'm looking for something that's going to surprise your opponent. He said it will. Where they said for purposes of X, we are not relying on exhaustion. Now, you've said repeatedly that that exists. I'm looking for where it is. Judge, I can only find what I wrote and that the court accepted and that I represented. You can't just say something and have the court accept it and then come to this court and say it's true. Judge Rogers, I wouldn't have written to the court that the parties are willing to have you, Judge Pearson, decide this and waive exhaustion if it weren't true. That was our understanding. That was Judge Pearson's understanding. If you want, I can probably find it in the record. It might have been wrong. Possibly, but I don't think I was. Do you rely on that in your briefs, that there was such a – It shouldn't be anything that you rely upon in your briefs that you can't support in the record. I'm sure I can support it in the record, and I'd be glad to – Maybe you can send us a letter with words, just two words. I'll send you a letter back, but as it happens, we went back and exhausted through the – You're going to find it and send it to us then, right? I will if I can. All you need is one sentence. Okay, very good. What I want to say is, though, it's probably moot because we went back and exhausted, and then the EEOC issued a right-to-sue letter on the claim, and then we filed a new complaint in the Northern District of Ohio, which the court assigned to the Cleveland Division. So there's now a complaint on this. The district court has jurisdiction of this matter. That's not before this record. You could take judicial notice of it. But what I'm saying is that I don't know that this is a major issue. I will send you the – That's what the district court relied on. The district court relied on. It's a speculative understanding of what would be the law, and it turned out to be – The dispute over the law was whether it's jurisdictional or not. That is correct. I only care whether it's jurisdictional or not if there's been a waiver. If there's not been a waiver, it wouldn't matter whether it was jurisdictional or not. So the whole thing, the whole dispute where it looks like the district court got it wrong, but they got it – it appears to have gotten whether it's jurisdictional wrong. But if it wasn't waived, you don't need to worry about whether it's jurisdictional or not. Is that true? I will supply the court with whatever evidence I have, although I think this case is coming up again in Cleveland, actually. Well, we won't worry about that here. All right. Thank you, Your Honors. And thank you. And the case is submitted. Court may be adjourned.